UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE APPLICATION OF PV GROUP LIMITED FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782 | Case No. 18- |

### MEMORANDUM OF LAW IN SUPPORT OF APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Applicant PV Group Limited ("PV Group") respectfully applies for an order of judicial assistance, pursuant to 28 U.S.C. § 1782, appointing Tara J. Plochocki, Esq. as a Commissioner of the Court to facilitate the issuance of subpoenas and the gathering of testimony and documentary evidence from JPMorgan Chase Bank N.A. ("JPMorgan"), Bank of New York Mellon ("Mellon"), and Citibank N.A. ("Citibank") (together, "Respondents"), which "reside in" or are "found in" the Southern District of New York. The information is sought for use in a legal proceeding against Dmitri and Alexei Ananyev ("the Ananyev Brothers" or "Brothers") and corporate entities owned or controlled by them (collectively, the "Ananyev Group"), filed in the High Court of Justice in the Business and Property Courts of England and Wales.

### FACTUAL BACKGROUND

This Application arises from investments made, lost, and stolen in Russia, denominated in U.S. dollars. The investors are individual customers of Promsvyaz Bank (PSB Bank) who were lured to invest in Guaranteed Fixed Rate Notes (the "Loan Notes") issued by Peters International (Cayman) Limited and guaranteed by Promsvyaz Capital and Peters International Investment N.V. (together, the Guarantors). Following default on the Loan Notes, certain investors transferred their Loan Notes into PV Group, a special purpose vehicle, for the purpose

1

of monetizing them, whether through litigation or sale on the private market.  Declaration of Tara J. Plochocki ("Plochocki Decl.") ¶¶ 3-5.

The Guarantors are in default of their obligations under the Loan Notes, which were issued as a temporary solution to the chronic, undisclosed undercapitalization of PSB Bank. The scheme was orchestrated and executed by the Ananyev Brothers, who, at all relevant times, owned and operated both the Guarantors and PSB Bank.  The Ananyev Brothers directed their agents to prey on PSB Bank's customers, who were a ready source of cash.  Their assets could be, and were, used to deceive Russian regulators into thinking that PSB Bank's financial position was better than it actually was.  The charade unraveled, and the Central Bank of Russia (CRB) took PSB Bank into administration in December 2017, but not before the Brothers could raid it, leaving their investors—ordinary Russia citizens persuaded to deposit their savings in the Loan Notes—with next to nothing.

There is concrete evidence that the Brothers illegally moved enormous amounts of money out of their banks in Russia and into foreign banks, and that they had been doing so for some time before PSB Bank was seized, including through the Loan Notes. The investors reasonably believe that transactions related to the U.S. dollar-denominated Loan Notes— purchased with U.S. dollars—passed through PSB Bank's U.S. correspondent accounts, as did other assets in U.S. dollars appropriated by the Brothers before ultimately landing in Cypriot banks.  Affiliated financial institutions Vozrozhdenie Bank ("Vozrozhdenie") and Fintailor Investments Ltd. ("Fintailor") were also used as conduits through which the Brothers could funnel cash to themselves as regulators closed in.

The investors who aggregated their Loan Notes in PV Group commenced proceedings in England and Wales against Ananyev Group for damages arising out of conspiracy,

misrepresentation, and deceit.  Decl. of Andrew Ford ("Ford Decl.") ¶ 43.  The investors also filed an application to freeze the assets of the Ananyev Group and were successful in obtaining a security in the amount of the claimed damages.  *Id*. ¶ 44.  Interested party PV Group, for and on behalf of the investors, seeks evidence located in this jurisdiction in support of the lawsuit against the Ananyev Group in the High Court of Justice in England and Wales.

    1.   **The Ananyev Brothers' Corporate Web**

PSB Bank was established by the Brothers in 1995.  Over the next 20 years, it rose to be one of the top banks in Russia by assets.  *Id.* ¶ 2.  In 2015, the Ananyev Brothers purchased Vozrozhdenie Bank for USD 200 million.  *Id.*  The Brothers held these banks through a complicated multinational corporate structure.  *Id.* ¶ 3.  PSB Bank was held by an intermediate holding company, a Dutch corporation named Promsvyaz Capital, which itself was owned by two English companies—Antracite Investment Limited and Urgula Platinum Limited—both incorporated in 2014 and also owned by the Brothers.  *Id.* ¶¶ 1, 4.  Promsvyaz Capital is the intermediate holding company for the Brothers' banking interests and the finance company for Promsvyaz Group.  *Id.* ¶ 5.  Peters International N.V. is a limited liability company incorporated in the Netherlands and operating out of Curacao.  *Id.* ¶ 6.  Promsvyaz Capital and Peters International are the guarantors of the Loan Notes issued to the investors.  *Id.* ¶ 7.  A different Peters International—one incorporated in Cayman—is the issuer of the Loan Notes.  *Id.* ¶ 8.

    2.   **PSB Bank Paints False Picture of Financial Health**

PSB Bank quickly rose to prominence, but stumbled when the Russian financial crisis struck in 2015 with the crash of the ruble.  *Id.* ¶¶ 10-11.  While this does not make PSB Bank unique among financial institutions in Russia, its response does.  To give the appearance of financial health and adequate reserves, PSB Bank fabricated sales of the bank's shares and the

creation of fake credit lines. Between January and September 2014, the addition of Ananyev-affiliated companies to PSB Bank's credit portfolio increased it by 30%, or by $500 million USD. *Id.* ¶ 10.1. There is justified skepticism that these transactions were arm's-length, or even legitimate indicia of an actual increase in credit. *Id.* ¶ 10.1. In June 2015, PSB Bank benefited from a similarly implausible boon: it increased its capital by nearly $222.5 million USD by selling 20% of the bank's shares to four non-state pension funds ("NPFs") controlled by associates of the Ananyev Brothers. *Id.* ¶ 10.2. This share sale resulted in a capital infusion and created the appearance of a healthy financial institution. This was not an illusion which the Brothers were able to sustain.

    **3. The Brothers Defraud Their VIP Clients by Soliciting Investments in the Loan Notes**

It appears that the Ananyev Brothers became increasingly desperate to amass cash for PSB Bank's reserves. They put together a plan to raise capital to support their distressed bank. Or, if that did not work, they could flee the country with whatever they were able to liquidate. To do so they needed a pretext to transfer capital held in the bank out of Russia, where they could have access to it if they needed it. They created one through the issuance of securities in the form of the Loan Notes. The Loan Notes are four bundles of securities:

a. EUR 30,000,000 Guaranteed Fixed Rate Notes due 2019, in denominations of EU 100,000, represented by a Permanent Global Note dated April 12, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. Interest under these EUR 2019 Notes was 5.15% per annum payable in April and October of each year until maturity.

b. USD 100,000,000 Guaranteed Fixed Rate Notes due 2019, in denominations of USD 100,000, represented by a Permanent Global Note dated April 12, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. The interest rate under these USD

    2019 Notes was 5.75% per annum, also payable in April and October of each year until maturity.

  c. EUR 30,000,000 Guaranteed Fixed Rate Notes due 2020, in denominations of EU 100,000, represented by a Permanent Global Note dated July 6, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date.  Interest under these EUR 2020 Notes was 5.25% per annum payable in July and January of each year until maturity.

  d. USD 70,000,000 Guaranteed Fixed Rate Notes due 2020, in denominations of USD 100,000, represented by a Permanent Global Note dated July 6, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date.  The interest rate under these USD 2020 Notes was 5.75% per annum, also payable in July and January of each year until maturity.

*Id.* ¶¶ 14.1-14.4.  The investors were each VIP clients of PSB Bank, a designation ostensibly meaning that the investor had a substantial amount of money in the bank.  *Id*. ¶ 1.  Each VIP client was assigned a relationship manager.  *Id.* ¶ 12.  In or around April 2017, these managers told the VIP clients that a select number of them were being offered the opportunity to invest their cash in the Loan Notes.  *Id.* ¶ 15.  The Loan Notes were an attractive investment.  They offered a higher rate of interest than an ordinary depository account, were relatively short term at two or three years, and were supposed to be very safe because they were guaranteed by the Ananyev Brothers, whom all knew to be the beneficial owners of PSB Bank and honorable, successful, and very wealthy.  The relationship managers marketed the Loan Notes to the VIP clients as a proxy for a bank deposit.  *Id.* ¶ 16.  Additionally, the trustee was Citibank N.A. in London and the law firm involved in the issuance was White & Case LLP.  *Id.* ¶¶ 16-17.  The Ananyev Brothers had excellent reputations in Russia, but the involvement of elite global

financial and legal institutions was an effective and deliberate selling point to reassure the investors that the securities were safe. The relationship managers aggressively pursued the VIP clients, calling them until they agreed to invest in the Loan Notes. *Id.* ¶ 17.

The investors were wealthy by Russian standards and kept most of their money in PSB Bank. With few exceptions, they were not elite financiers. One of them had a life savings of 600,000 Euro. *Id.* ¶ 1. Most of them invested a significant portion of their life savings. *Id.* ¶ 13. They were told, variously, that the Loan Notes were being issued to reach higher capital threshold requirements, as mandated by "Basel III," *id.* ¶ 18, and that the money invested would be reinvested in an area relevant to his or her own education or business to make the investment more attractive on a personal level. *Id.* ¶ 19. Despite the elaborate narratives designed to solicit investment commitments, one investor observed that her relationship manager did not appear to understand how the Loan Notes were structured. When asked, the manager averred that they were backed by the Brothers and that PSB Bank was stable and could be taken at its word. *Id.* ¶ 20. As it would turn out, this was not a particularly meaningful representation. PSB Bank was in trouble, and so were the Brothers.

### 4. PSB Bank's True Financial Health

PSB Bank was woefully undercapitalized. At the same time Peters International issued the Loan Notes and the investors transferred their liquid capital to purchase the securities, the CBR was conducting an audit of the bank. In May 2017, the results were in, and they were not good. The CBR concluded that PSB Bank had a shortfall of RUB 104 billion, or USD 1.65 billion. *Id.* ¶ 27. PSB Bank was hardly alone; Russian banks were enduring crises in the wake of the collapse of the ruble in 2015. CBR investigated four major Russian banks in the summer of 2017, PSB Bank among them. The Russian public had no idea of the true state of affairs until

a "Letter to Customers," authored by an analyst at Alfa Bank, was leaked to the press. It revealed that four of Russia's top banks were in radical states of distress. *Id.* ¶ 21. The Ananyev Brothers dismissed the claims therein as mischief from a competitor, but the investors in the Loan Notes were worried that the securities peddled by the bank just a few months earlier were not good, and feared they would not be able to get their money back. *Id.* ¶ 22.

Various investors contacted their relationship managers, and some even met with Dmitri Ananyev himself. *Id.* All were assured that there was nothing whatsoever to worry about. *Id.* Nevertheless, some investors sought to get their money bank and sell the Loan Notes. One such investor was Mr. Kochkalda, who instructed his relationship manager, Ms. Alexeeva—the point person for many of the defrauded VIP clients—to sell his Loan Notes in or around autumn of 2017. She claimed to have attempted to sell the Loan Notes in the private market, but reported that she had been unsuccessful in finding a buyer. *Id.* ¶ 22-23. Her claim is of questionable veracity; the investors were not all told the same story. Another investor, Mr. Tokarev, was informed by the deputy manager of PSB Bank in late September 2017 that PSB Bank was in the best condition, and there was a line of people who wanted to buy the Loan Notes. *Id.* ¶ 24. Whether they wanted them or not, the investors were stuck with their securities, and it was becoming increasingly clear that they were worthless.

Rumors proliferated and augured the worst. One investor, Ms. Titova, the former head of UBS Russia, heard through her contacts that PSB Bank had been on the precipice of default for a long time, and the Brothers had been withdrawing funds from the bank for their own personal use. *Id.* ¶ 26. Mr. Tokarev heard that Dmitri was leaving Russia; Dmitri himself dismissed the accusation as meritless. *Id.* ¶ 25. Despite increasing anxiety, the investors in the

2019 Notes each received their first interest payment in October 2017. So although by all objective metrics, the outlook was not good, there had been no default just yet.

    **5. Things Fall Apart – December 2017**

PSB Bank and CBR attempted to negotiate a resolution to their capital problem short of a formal takeover. These negotiations failed; CBR took action. On December 11, 2017, PSB Bank was told by CBR to establish reserves of $1.5 billion USD or be placed into administration. *Id.* ¶ 28. This it did not do, and there are no records to suggest that it even tried. The Brothers' focus was not on putting money into the bank, but rather taking it out. In the meantime, CBR imposed a set of restrictions but unfortunately did nothing to enforce them. Key among these were that PSB Bank limit acquisitions of its own shares to less than one million rubles per month. *Id.*

The CBR announced that the bank would be placed into provisional administration on December 15, 2017. *Id.* ¶ 29. It was one day too late. On December 14, 2017, through a series of convoluted transactions between related parties, the Brothers emptied out the bank and ran. In conspiracy with the NPFs who had suspiciously increased PSB Bank's capital during the liquidity crisis of 2015, these entities were now prepared to sell back the 20% interest. On the afternoon of December 14, 2017, the NPFs placed money on deposit with PSB Bank. Promsvyaz Capital—the Brothers' financial holding company—placed an order for 233 billion of the bank's shares *through* PSB Bank itself. *Id*. PSB Bank submitted seven buy-orders on the Moscow Stock Exchange, five of which were filled within seconds by the NPFs. Promsvyaz Capital therefore acquired 222.9 billion shares in PSB Bank in seconds, for a purchase price of $262.8 million, well over what the NPFs had paid for the shares in 2015. While the bank's profile was not rosy in 2015, it certainly was not improved at this juncture, on the eve of being

placed under state control for lack of capital. Promsvyaz Capital then sold its shares to PSB Bank immediately, which paid for them, immediately, by transferring the entire purchase price of 16.51 billion rubles to Promsvyaz Capital's account in Cyprus. *Id.* ¶¶ 30.1-30.6. And just like that, PSB Bank was finished.

The CBR discovered the fraud shortly thereafter, and on December 22, 2017, it announced findings of criminal activity. Again, it was a day too late. Dmitri Ananyev had fled to London the night before; and Alexei had departed as well. *Id.* ¶¶ 36-37. Assets disappeared from the Brothers' others financial institutions as well. They withdrew 4.5 billion rubles from Vozrozhdenie in late December, and cut Promsvyaz Capital's direct ties with the banks, transferring its ownership interests to Cypriot entities instead. *Id.* ¶¶ 38-39. The Brothers' assets—among them, the investors' capital—are hidden away somewhere. Just definitely not in Russia.

The Ananyev Group has actively prevented repatriation of their assets back to Russia. Fintailor, a Cypriot entity owned by an associate of the Ananyev Brothers and set up through PSB Bank, obtained a court order in Cyprus prohibiting PSB Bank's administrators from holding less than $251 million USD in its correspondent accounts at Deutsche Bank, JPMorgan Chase, and Credit Suisse. *Id.* ¶ 41.

On May 3, 2018, Citibank published a Notice to Noteholders that Peters International Investment N.V. and Promsvyaz Capital B.V. were officially in default on the interest payments due under the USD 2019 Notes. *Id.* ¶ 42. PSB Bank is in receivership and cannot refund the investors' money; it doesn't have it. The only way for the investors to recoup their losses is a suit directly against the Brothers for the damages arising out of their fraud.

B.     **The Proceeding in the United Kingdom**

The investors have already filed suit in the Commercial Court of the High Court of Justice of England and Wales. They filed their Claim and Particulars of Claim, along with an application for a freezing order, on July 3, 2018. They obtained an order requiring the Ananyev Group to post security in the amount of $15.6 million USD and 11 million Euro or, alternatively, have all of their accounts frozen. *Id.* ¶¶ 43-44. The Ananyev Group posted a security in the amount of the damages claimed. *Id*. ¶ 43. The investors' suit is based on common law causes of action for conspiracy to injure by unlawful means, misrepresentation, and deceit. *Id.* ¶ 44. English counsel for investors, solicitor Andrew Ford of the law firm Lipman Karas in London, represents that these are viable causes of action under English law, and that English law applies to these claims. *Id.*

C.     **Evidence of Using the U.S. Financial System to Perpetrate Fraud**

The Brothers were only able to pull off their fraud by maintaining access to bank accounts in other countries through which they could siphon money out of PSB Bank and Vozrozhdenie in Russia for their own purposes. The CBR has determined that Fintailor, too, is harboring an additional trove of liquid assets connected to PSB Bank offshore. Plochocki Decl. ¶ 11. All of this is being conducted outside of Russia, with a meaningful nexus to the United States. The Brothers were not after rubles, but currencies that could be easily used abroad. The Loan Notes were the perfect securities to obtain this liquidity because they were denominated in U.S. dollars and Euros. Additionally, the investors paid for and received their October 2017 interest payment in those currencies.

Upon information and belief, PSB Bank used its U.S. correspondent accounts with JPMorgan Chase Bank, Bank of New York Mellon, and Citibank N.A. in New York to conduct

transactions denominated in U.S. dollars, including without limitation the transactions relating to the Loan Notes.  At least three financial institutions within the Ananyev Group have U.S. correspondent accounts with these banks.  PSB Bank uses all three and lists these accounts on its website.  *Id.* ¶ 6.  Fintailor also maintains a correspondent account with JPMorgan Chase, as does Vozrozhdenie Bank, in addition to a second account with Bank of New York Mellon.  *Id.*

The investors, through PV Group, seek records dating from April 2017, at the time the investors purchased the Loan Notes, to the present day, which relate to the correspondent accounts belonging to PSB Bank, Fintailor, and Vozrozhdenie maintained at JP Morgan, Mellon, and Citibank for the purpose of illustrating how the Brothers used these accounts to direct cash to themselves, or entities owned or controlled by them.  Such entities include without limitation:  Antracite Investment Limited, Urgula Platinum Limited, Menrela Limited, Promsvyaz Capital B.V., Peters International (Cayman) Limited, Peters International Investment Limited N.V., Postscriptum Capital Limited, and Fintailor Investments Limited.

Having conducted transactions in U.S. dollars in connection with the purchase of the Loan Notes, and having similarly received interest payments in U.S. dollars, the investors reasonably believe that the U.S. correspondent accounts played a role in facilitating the Brothers' ability to steal funds from the investors and perpetrate fraud.  Transfers involving U.S. dollars would likely have been completed using the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") wire payment system.  *Id.* ¶ 10.  These wire payments, denominated in U.S. dollars, would have flowed through correspondent banking accounts located in this jurisdiction, where Citibank, JPMorgan Chase, and Bank of New York Mellon facilitate these transactions, *id.* ¶¶ 7-9, and where they maintain records of these transfers in

their ordinary course of business in compliance with the Bank Secrecy Act, 31 U.S.C. § 5311 *et seq*.

These banks' records will contain valuable evidence for the investors' lawsuit in the U.K. They will show the disposition of funds wired by PSB Bank. Documentation of the flow of funds through these accounts will help adduce claims that 1) the capital invested in the Loan Notes was not used as the relationship managers had indicated they would be; and 2) PSB Bank, Vozrozhdenie Bank, and Fintailor Investments Ltd. directed U.S. dollars to the Ananyev Group for no consideration, and misappropriating assets which belonged to the investors and other PSB Bank customers. Documents showing either of these facts could be used to document the global financial web constructed by the Brothers, and to support investors' claims that the Brothers and their agents made fraudulent misrepresentations concerning the Loan Notes, and fraudulently misappropriated those funds instead of making the interest payments on the Loan Notes, triggering default on their contractual obligations.

## **LEGAL ARGUMENT**

Section 1782 Applications must meet three statutory requirements. *Mees v. Buiter*, 793 F.3d 291, 297 (2d Cir. 2015). When an Application meets the statutory requirements, courts consider four discretionary factors, bearing in mind Section 1782's twin aims of "providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts." *Id.* at 297-98 (quoting *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004)).

## IV. THE APPLICATION MEETS ALL THREE STATUTORY REQUIREMENTS OF 28 U.S.C. § 1782

PV Group's Application meets the three statutory requirements of Section 1782. The statute requires that: "(1) the person from whom discovery is sought resides (or is found) in the district of the district court to which the application is made, (2) the discovery is for use in a foreign proceeding before a foreign [or international] tribunal, and (3) the application is made by a foreign or international tribunal or any interested person." *Mees*, 793 F.3d at 297 (quoting *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012)). PV Group's application handily meets these requirements.

### A. Respondents "reside" and are "found in" this District because they do business in Manhattan and maintain their correspondent accounts here.

PSB Bank, Vozrozhdenie, and Fintailor transferred and obtained U.S. dollars using correspondent accounts with JPMorgan Chase, Bank of New York Mellon, and Citibank N.A. These banks are located in this District, Plochocki Decl. ¶¶ 7-9, and the records sought by this application are within their possession, custody or control.

The Respondents have offices and headquarters in the Southern District of New York with business addresses as follows:

- For JPMorgan Chase Bank N.A.: 270 Park Avenue, New York, NY 10017
- For Bank of New York Mellon: 240 Greenwich Street, New York, NY 10286.
- For Citibank N.A.: 388 Greenwich Street, New York, NY 10013.

*Id*. ¶¶ 6-9. Respondents thus maintain correspondent accounts, offices, and headquarters in Manhattan and therefore reside and are found in the Southern District of New York, and PV Group's Application therefore meets Section 1782's first statutory requirement.

### B. PV Group's requested discovery is for use in a foreign proceeding in the United Kingdom.

PV Group's requested discovery is for use "in a proceeding" before "a foreign . . . tribunal." 28 U.S.C. § 1782. In analyzing this aspect of Section 1782, courts focus "on two questions: (1) whether a foreign proceeding is adjudicative in nature; and (2) when there is actually a foreign proceeding." *In re Application of Euromepa, S.A.*, 154 F.3d 24, 27 (2d Cir. 1998). The investors have filed an action against the Ananyev Group in the Commercial Court of the High Court of Justice of England and Wales. There can be no question that the litigation before the English and Welsh court is adjudicative in nature, and hence constitutes a "proceeding." The requested discovery is thus "for use in a proceeding [before] a foreign or international tribunal" within the meaning of Section 1782, meeting the Section's second requirement.

### C. PV Group is an "interested person," since it is the holding entity for assets of the plaintiffs in the foreign proceeding in the United Kingdom.

PV Group is an "interested person" for purposes of Section 1782. It holds the assets of the individual defrauded investors, including the Loan Notes, which are the subject of the breach and fraud claims. PV Group acts entirely on behalf of those investors for the purpose of monetizing the Loan Notes, and may itself appear as a plaintiff in the U.K. proceeding. The statutory term "interested person" encompasses parties and contemplated parties to a foreign litigation. *See* 28 U.S.C. § 1782 (captioned "Assistance to foreign and international tribunals and to litigants before such tribunals"); *Intel v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 256 (2004) ("No doubt litigants are included among . . . the 'interested person[s]' who may invoke § 1782."); S. Rep. No. 1580, 88th Cong., 2d Sess. (1964) (stating that an "interested person" includes one who is a "party to . . . foreign or international litigation"); *cf. In re Application of*

14

*Malev*, 964 F.2d 97, 101 (2d Cir. 1992) (noting that the phrase "upon the application of any interested person" was inserted into § 1782 "as part of the effort to liberalize the assistance provided by American courts to foreign and international tribunals"); *Mees*, 793 F.3d at 294, 304 (holding applicant contemplating suit "indisputably" was "interested person" under Section 1782). PV Group is an agent of the investors; it is a vehicle existing entirely for the purpose of investors' interests in obtaining value for their Loan Notes. Agents of parties to the foreign proceeding satisfy the interested person requirement. *In re Schlich*, No. CV 16-91278-FDS, 2016 WL 7209565, at *3 (D. Mass. Dec. 9, 2016), *reconsideration denied*, No. CV 16-91278-FDS, 2017 WL 1015005 (D. Mass. Mar. 15, 2017), and *aff'd,* 893 F.3d 40 (1st Cir. 2018).

For these reasons, PV Group meets the third and final statutory requirement of Section 1782, and thus the Court should turn to the discretionary factors outlined by the Supreme Court in *Intel*.

## V.   THE APPLICATION SHOULD BE GRANTED IN THE EXERCISE OF THE COURT'S DISCRETION

The granting of this Application for judicial assistance is an appropriate exercise of this Court's discretion in aid of the contemplated proceeding before the High Court of England and Wales. The Supreme Court set forth four factors to be considered in exercising discretion under Section 1782. *See Intel*, 542 U.S. at 264-65; *Mees*, 793 F.3d at 298.

First, a favorable exercise of discretion is most warranted where, as here, the respondent from whom discovery is sought is not a party to the foreign proceeding, because such a person "may be outside the foreign tribunal's jurisdictional reach" and "their evidence, available in the United States, may be unobtainable absent § 1782(a) aid." *Intel*, 542 U.S. at 264. This is an apt description of PV Group's circumstances, as Respondents and the records sought may be beyond the disclosure powers of the High Court of England and Wales.

Second, the Court may consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Id.*  The United Kingdom proceeding is an appropriate subject of judicial assistance; its common law undergirds American jurisprudence, and courts in the United Kingdom are receptive to U.S. judicial assistance. *La Suisse, Societe d'Assurances Sur La Vie v. Kraus*, 62 F. Supp. 3d 358, 362 (S.D.N.Y. 2014) (determining that all four *Intel* factors weigh in favor of granting 1782 discovery aimed at United Kingdom proceeding).  Moreover, as discussed above, the proceeding before the High Court of Justice of England and Wales is quintessentially adjudicative, and there is no indication that the Queen's judiciary would object to the judicial assistance sought from this Court.

Third, the *Intel* Court has stated that a district court may consider "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States" and fourth whether the discovery requests are "unduly intrusive or burdensome." 542 U.S. at 264-65.  The present application seeks neither to circumvent foreign disclosure restrictions nor to impose onerous or unnecessary burdens on respondents, and it is unlikely to do so. Rather, the Application seeks the authorization to issue subpoenas for information for use in the investors' lawsuit in the High Court of Justice of England and Wales from entities that are not parties to that case.  Specifically, PV Group seeks to obtain from Respondents documents and information relating to transactions originating from or directed to the Ananyev Group or involving the investors' own accounts.  A draft of PV Group's requests is attached as Exhibit A to the Plochocki Declaration.  The requests are narrowly tailored to specific entities to elicit relevant information without unnecessarily burdening Respondents.

The discretionary factors articulated by the Supreme Court therefore all weigh in favor of granting PV Group's Application.

## CONCLUSION

For the foregoing reasons, PV Group's Application for Judicial Assistance should be granted.

Respectfully submitted,

Dated: August 17, 2018

s/ Tara J. Plochocki
Tara J. Plochocki
**LEWIS BAACH KAUFMANN MIDDLEMISS PLLC**
The Chrysler Building
405 Lexington Avenue, 62nd Floor
New York, New York 10174
Tel: (212) 826 7001
Fax: (212) 826-7146
tara.plochocki@lbkmlaw.com