UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE APPLICATION OF PV GROUP LIMITED FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

Case No.

DECLARATION OF ANDREW J. FORD IN SUPPORT OF APPLICATION FOR JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, **ANDREW J. FORD**, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am a solicitor and principal of Lipman Karas LLP. My firm represents a number of individual customers (the "Investors") of Promsvyaz Bank ("PSB Bank") in the context of their dispute concerning certain Guaranteed Fixed Rate Notes (the "Loan Notes") issued by Peters International (Cayman) Limited ("Peters Cayman"), and guaranteed by Promsvyaz Capital B.V. ("Promsvyaz Capital") and Peters International Investment N.V. ("Peters International") (together the "Guarantors"). At all material times, the ultimate ownership of the Guarantors was held by Dmitri Ananyev and his brother Alexei Ananyev (together, the "Ananyev Brothers") through Antracite Investment Limited and Urgula Platinum Limited (together the "English Companies"). The Ananyev Brothers were also, through their ownership of the English Companies, majority beneficial owners of PSB Bank. The Investors are individuals, all of whom were clients of PSB Bank, and considered by PSB Bank as "VIP Customers," due to the amount of funds they deposited with the bank. The Investors were wealthy by most Russians' standards, but most had liquid investments of less than USD 1 million. By way of example, one Investor, Ms. Elena Nikolaevna Tsareva ("Ms. Tsareva") opened a deposit account with PSB Bank in December 2013, into which she transferred her life savings of about EUR 600,000.

2. In May 1995, the Ananyev Brothers established PSB Bank. At the beginning of 2001, it was the 46th largest bank by assets in Russia. In the early 2000s, it joined the top twenty banks. By 2005, PSB Bank had managed to establish and maintain 29 regional branches, one of which was in Cyprus. In 2015, the Ananyev Brothers purchased Vozrozhdenie Bank for USD 200 million.

3. The structure underlying the Ananyev Brothers' business activities appears to be highly complicated, with the foundation of its banking activities in London.

4. Historically the Ananyev Brothers' main ownership of PSB Bank was through Promsvyaz Capital B.V. ("Promsvyaz Capital"), a company incorporated in the Netherlands. Promsvyaz Capital itself is owned by the two English companies — both incorporated in 2014 (0.005% is owned by Menrela Limited). I understand that the English Companies are now ultimately owned and controlled by Dmitri Ananyev, although formerly each brother owned one of the English Companies.

5. Promsvyaz Capital appears to be the intermediate holding company for the Ananyev Brothers' banking interests, ultimate ownership and control resting with the English Companies. Until the state assigned ownership to a state entity (The Deposit Insurance Agency) Promsvyaz Capital held 70.05% of the shares in PSB Bank and 52.7% of Vozrozhdenie Bank. Certainly, this was the position regarding share ownership at the time the Investors purchased the Loan Notes in 2017.

6. Peters International is a limited liability company incorporated in the Netherlands Antilles in 1998 with the Curacao Chambers of Commerce number #79241(0). Its business address is at Kaya Richard J Beaujon z/n, PO Box 837, Curacao.

7. Promsvyaz Capital and Peters International are the Guarantors of the Loan Notes.

8. Peters Cayman is the issuer of the Loan Notes. It is an exempted company with limited liability incorporated in the Cayman Islands (registered number MC-197149), whose registered office is c/o Maples Corporate Services Limited, PO Box 309GT, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands.

9. At the time the Investors bought the Loan Notes, PSB Bank had inadequate capital and a liquidity crisis. However, the Ananyev Brothers portrayed a false picture of a successful and stable bank and business empire by means of deceit.

10. PSB Bank enjoyed a rapid and meteoric rise followed by a period of difficulty. Though this is not uncommon in the global banking community, the Ananyev Brothers' response to difficult financial periods was to misrepresent the bank's financial position by means of fictitious sales of the bank's shares and the creation of fake credit lines. There were two significant deceits, of which I am aware:

> 10.1. In January to September 2014, PSB Bank's total credit portfolio of corporate clients increased, in suspicious circumstances, by 30% (USD 500 million). It is alleged that the credit portfolio was made up predominantly of companies affiliated with PSB Bank and the Ananyev Brothers. There is a powerful inference to be drawn that around USD 500 million of PSB Bank's assets were fake and valueless loans; and
>
> 10.2. In June 2015, PSB Bank reported an increase in its capital of almost RUB 14 billion (USD 222.5 million). This money was generated by the Ananyev Brothers selling 20% of the bank's shares to four non-state pension funds ("NPFs") controlled by associates of the Ananyev Brothers: Boris Mints and Mikhail Shishkhanov and his uncle Mikhail Gutseriev. As I describe below, the NPFs

overpaid for the shares. I infer that these related-party share purchases were intended to give the false impression of the bank's capital increasing by RUB 14 billion (USD 222.5 million).

11. In 2015, Russia suffered a financial crisis: interest rates rose, many people defaulted on their mortgages and interest rates for foreign exchange deposits fell to around 2-3% having been around 6-8% for the previous fifteen years or so. After the financial crisis, PSB Bank started to offer its clients tradeable subordinated Loan Notes with a rate of interest of between 6 and 7%.

12. Each of the Investors had a designated relationship manager with whom they were in regular contact concerning their banking requirements. All of the Investors were encouraged by their relationship managers at PSB Bank to invest in the Loan Notes. The Investors trusted the bank and its staff implicitly and, in reliance on representations made to them about the Loan Notes, took up this opportunity and transferred funds from their deposit accounts at PSB Bank to a nominated account at PSB Bank; in return, they received the Loan Notes.

13. For each of the Investors, the Loan Notes represent a significant amount of their inherited and earned wealth.

14. The Loan Notes consist of:

14.1. EUR 30,000,000 Guaranteed Fixed Rate Notes due 2019, in denominations of EU 100,000, represented by a Permanent Global Note dated April 12, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. Interest under these EUR 2019 Notes was 5.15% per annum payable in April and October of each year until maturity.

4

14.2. USD 100,000,000 Guaranteed Fixed Rate Notes due 2019, in denominations of USD 100,000, represented by a Permanent Global Note dated April 12, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. The interest rate under these USD 2019 Notes was 5.75% per annum, also payable in April and October of each year until maturity.

14.3. EUR 30,000,000 Guaranteed Fixed Rate Notes due 2020, in denominations of EU 100,000, represented by a Permanent Global Note dated July 6, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. Interest under these EUR 2020 Notes was 5.25% per annum payable in July and January of each year until maturity.

14.4. USD 70,000,000 Guaranteed Fixed Rate Notes due 2020, in denominations of USD 100,000, represented by a Permanent Global Note dated July 6, 2017 held by Citibank as trustee pursuant to a Trust Deed of the same date. The interest rate under these USD 2020 Notes was 5.75% per annum, also payable in July and January of each year until maturity.

15. Beginning in or around April 2017, PSB Bank relationship managers told the VIP customers that a select number of them were being offered the opportunity to invest their cash in the Loan Notes.

16. In early 2017, PSB Bank held meetings with Investors and showed a presentation, led by one of the relationship managers, emphasizing that the Loan Notes offered a far better rate of interest than the interest rate being offered on bank deposits around that time. At the meeting, the Investors were told that the Loan Notes were extremely safe because they were guaranteed by the Ananyev Brothers. They further learned that Citibank N.A. was the trustee. The Loan Notes

were marketed as a proxy for a bank deposit: a very safe investment with a good rate of interest and guaranteed by the owners of PSB Bank, the Ananyev Brothers.

17. PSB Bank continued showing the presentation and holding meetings concerning the Loan Notes. When certain Investors did not immediately invest in the Loan Notes, relationship managers were persistent in calling them, reiterating how safe the Loan Notes were. The relationship managers stressed that the Loan Notes were safe because they were guaranteed by the Ananyev Brothers as well as having Citibank as the trustee and White & Case as the lawyers involved.

18. Investors were told at various times that PSB Bank needed to issue loan notes in order to reach higher capital threshold requirements, as required by "Basel III." Basel III is an internationally agreed set of measures developed by the Basel Committee on Banking Supervision in response to the financial crisis of 2007-2009.

19. The Investors were told that the money would be used in an area relevant to his or her own business or education. This was, no doubt, done to ensure that the bank's customer was persuaded to buy the Loan Notes rather than being an indication of what the Ananyev Brothers planned to do with the monies raised by the scheme.

20. At least one Investor, Elena Borisovna Titova ("Ms. Titova") noted that, when she asked her relationship manager questions about how the loan notes were structured, the flow of funds, and how the proceeds of the loan notes would be used, she got the impression that the relationship manager did not understand the structure of the loan notes herself. In that instance, Ms. Titova appreciated that the relationship manager was a sales-person and was happy to rely on PSB Bank's stability, its word, and the guarantee by the Ananyev Brothers.

21. In August 2017, Sergei Gavrilov, an analyst at Alfa Bank wrote a "Letter to Customers," which was then leaked to the press, mentioning that four banks: PSB Bank, BINBank, Otkritie Bank, and Moscow Credit Bank were in perilous straits. Most of the Investors became aware of this letter. Despite the fact that this letter appeared in the media and online, PSB's Bank staff – and the Ananyev Brothers themselves – dismissed the information contained therein, portraying it as mischief from a competitor. The Alfa Bank analyst was, as it transpired, correct.

22. In autumn of 2017, Investors saw articles in the press that were triggered by the "Letter to Customers". These articles stated that PSB Bank was in financial difficulty, and the articles predicted its collapse. In response, the Investors contacted their relationship managers, and some even met with Dmitri Ananyev himself. All were assured that there was nothing to worry about. Nevertheless, some Investors sought to get their money back and to sell the Loan Notes. Mr. Gennady Anatolievich Kochkalda ("Mr. Kochkalda"), for example, contacted his relationship manager, Ms. Alexeeva, and told her that he would like to sell the Loan Notes. Ms. Alexeeva explained that the Loan Notes were not publicly traded and so the only opportunity would be to sell them privately. She said that he would need to sign an order for sale which would allow her to contact potential buyers within PSB Bank's network and that it would take about two weeks to sell the Loan Notes. Mr. Kochkalda understood that this meant that they would be sold to other clients of PSB Bank.

23. After a number of weeks, Mr. Kochkalda's Loan Notes remained unsold. Ms. Alexeeva continued to be reassuring and asked Mr Kochkalda to sign some further documents. The last set of documents that Mr. Kochkalda signed had an open date, which would allow Ms. Alexeeva to sell the Loan Notes as soon as she found a buyer. However, no buyer was found.

24. Another investor, Mr. Andrey Vladislavovich Tokarev ("Mr. Tokarev"), similarly became concerned about the Loan Notes in August 2017 when he read press articles that were triggered by the "Letter to Customers". Alarmed, he met with his relationship manager, Ms. Kuznetsova, who told him that he need not worry and that there was no truth in the content of the letter. Not sufficiently placated, Mr. Tokarev pushed for a meeting with senior representatives of PSB Bank. On September 26, 2017, he attended a meeting with Tatyana Voloshkina ("Ms. Voloshkina"), the deputy manager of PSB Bank (and Head of Brokerage), and Ms. Kuznetsova at PSB Bank's head office. The meeting lasted for around an hour and a half. Mr. Tokarev was told that PSB Bank was in the best condition and that there was a queue of people who wanted to buy the Loan Notes. Mr. Tokarev said that if that was the case then he would like to sell his Loan Notes. Ms. Voloshkina told Mr. Tokarev that she would need to bring this request to the attention of the Ananyev Brothers. Dissatisfied with this response, Mr. Tokarev asked for a meeting with the bank's owners. A meeting was arranged for November 2017.

25. On November 14, 2017, Mr. Tokarev attended a meeting with Dmitri Ananyev, Ms. Voloshkina, and others. Dmitri Ananyev reassured Mr. Tokarev that everything was well with the bank and that he should not worry. He told Mr. Tokarev that while there was a shortfall in the bank's capital, it was on the brink of signing a contract with the Russian army which would resolve the issue completely. During the meeting, Mr. Tokarev asked Dmitri Ananyev about rumours that he was planning to leave Russia. Dmitri Ananyev responded by stating that he and his five children are Russian patriots and would not be leaving Russia.

26. In November 2017, Ms. Titova, mentioned in paragraph 20 above, began to have serious concerns regarding the Loan Notes and the stability of PSB Bank. She had heard rumours that there was a shortfall in paid-up capital. She decided that she wanted to sell her Loan Notes,

and told her representative manager, Ms. Kuznetsova, this. She was informed that this was not possible. When she asked Ms. Kuznetsova about the issue with the alleged shortfall in capital she was told that the owners of the bank (i.e. the Ananyev Brothers) were actively engaged with investors. Ms. Titova had served as the Group Country Chief Executive for Russia at UBS Group from 2014 to 2017; through her contacts in the banking industry, Ms. Titova has since been told that PSB Bank had suffered a capital deficiency for a long time and had been on the brink of default because the Ananyev Brothers had been withdrawing funds from the bank for their personal use.

27. In 2017, due to the poor performance of some of the major banks, the Central Bank of Russia ("CBR") instigated a drive to clean up the banking industry by conducting a comprehensive audit of several Russian banks, including PSB Bank. PSB Bank's audit was completed by the end of May 2017: It was discovered that the bank had a shortfall of RUB 104 billion (USD 1.65 billion) in its reserves. Bad debt at the bank represented about 19% of the total credit portfolio (market average being 12%). This was despite the bank reporting in 2017 that it had assets worth RUB 1.5 trillion (USD 23.8 billion), capital of RUB 86 billion (USD 1.3 billion), and profit of RUB 8 billion (USD 127 million).

28. Following the CBR's investigations, the CBR and the Ananyev Brothers held negotiations to identify ways to rectify PSB Bank's financial situation. However, negotiations ultimately failed, and the CBR decided to take action. On December 11, 2017, CBR demanded that PSB Bank create reserves of over RUB 100 billion (USD 1.5 billion) and issued a directive limiting the bank to acquisitions of its own shares of less than RUB 1 million per month — a directive which PSB Bank violated almost immediately.

29. On December 15, 2017, the CBR announced that PSB Bank was in provisional administration. Shortly afterwards, however, it was discovered that on the eve of the

administration, on December 14, 2017, various highly suspicious transactions occurred, which subsequently led the CBR to start criminal investigations and restitutionary proceedings against various parties. On December 14, 2017, PSB Bank, through what the CBR described as a complicated set of unauthorised and related-party transactions, effectively 'purchased' 20.02% of its own shares from four associated NPFs – via Promsvyaz Capital – for RUB 16.51 billion, which were subsequently written off as valueless. These are the NPFs that I mentioned above in paragraph 10.2. which had made suspicious share purchases in June 2015.

30.  The chain of events of 14 December 2017 is not entirely clear, but appears to be as follows:

30.1.  The NPFs placed money on deposit with PSB Bank;

30.2.  Promsvyaz Capital issued instructions to PSB Bank, as broker, to buy just over 233 billion of the bank's shares;

30.3.  PSB Bank submitted seven buy-orders on the Moscow Stock Exchange;

30.4.  Five of the seven buy-orders were filled (within seconds) by the NPFs that had bought PSB Bank shares in suspicious circumstances in 2015. The purchase price was RUB 16.51 billion (USD 262.8 million) for 222.9 billion shares. It should be noted that this price was more that the NPFs apparently paid for the shares, despite the original price being over-inflated. The other two buy-orders were not filled;

30.5.  The transaction was executed through the Moscow Exchange as a standard 'T+2+ settlement'; accordingly, the selling company was to receive the purchase price in two business days (i.e., on Monday, December 18) from Promsvyaz Capital;

30.6. Promsvyaz Capital sold its newly acquired shares to PSB Bank immediately, which PSB Bank paid for immediately. It did so by transferring RUB 16.51 billion to Promsvyaz Capital's account (in Cyprus).

31. Thus, Promsvyaz Capital received from PSB cash the sum of RUB 16.51 billion in apparent exchange for shares in PSB Bank that were, essentially, valueless.

32. The net effect of the December 2017 Transactions appears to have been that the Ananyev Brothers were able to extract cash from PSB Bank immediately prior to -- i.e., the day before – its provisional administration, and remove that cash from Russia to Cyprus, where the Ananyev Brothers have control of Postscriptum Capital Limited and very many other companies and, I infer, business interests.

33. To rub salt into the wound, the NPFs claimed the return of their deposits, which were placed on December 14, 2017, once the deposit term had matured, a week later. The provisional administrator has brought a claim to rescind the relevant deposit contracts.

34. The CBR continued to review the accounts and files of the bank and announced in a statement that PSB Bank would require between RUB 100-200 billion to complete a bailout. Additionally the CBR directed the Ananyev Brothers (under the terms of the mooted bailout) that they had 90 days from 15 December 2017 to reduce their shareholding in Vozrozhdenie Bank from approximately 80% to 10%.

35. On December 22, 2017, the CBR released a statement saying that it had approved a recapitalisation strategy for PSB Bank under the CBR's consolidation fund – in essence, nationalising PSB Bank. It also announced that it had contacted law enforcement agencies after identifying criminal activity conducted by PSB Bank's former management (i.e., the Ananyev Brothers). This included the events surrounding the December 2017 Transactions and the

destruction or removal of credit dossiers for corporate loans worth RUB 109 billion (notably the size of the deficit found by the CBR's May 2017 investigation).

36. On the eve of the announcement by the CBR of findings of criminal activity, Dmitri Ananyev fled Russia, flying to London, on December 21, 2017. I do not believe he has returned to Russia since this date.

37. Alexei Ananyev also left Russia, but returned in January 2018 seemingly to dispose of entities and assets located in Russia.

38. On December 28-29, 2017, two weeks after the provisional administration of PSB Bank, Alexei and Dmitri Ananyev withdrew RUB 4.5 billion from their personal accounts at Vozrozhdenie Bank.

39. On 31 December 2017, Promsvyaz Capital was no longer listed as a shareholder in Vozrozhdenie Bank, despite owning a 52.7% stake on 22 August 2017. Vozrozhdenie Bank's shareholders are now almost 90% Cypriot entities. I infer that the Ananyev Brothers caused Promsvyaz Capital to transfer its shareholdings to the Cypriot entities controlled and ultimately beneficially owned by them.

40. Since the provisional administration of PSB Bank by the CBR, a number of cases have been initiated before the Moscow Court of Arbitration, to which PSB Bank and its affiliates are parties. None of these cases involve the Investors or have the Loan Notes as their subject matter. Further, none of these cases have either of the English Companies as a party.

41. In February 2018, the Cypriot Court in Limassol granted an application by Fintailor Investments Limited (a company that I believe to be associated with the Ananyev Brothers), banning PSB Bank's administrators from holding less than USD 251 million in correspondent accounts at foreign banks like Deutsche Bank, JP Morgan Chase, Credit Suisse and others. The

Cypriot Court also prohibited PSB Bank's administrators from making transfers from accounts in Fintailor's name at PSB Bank outside Cyprus without approval. Both these actions by the Cypriot Court were taken to ensure PSB Bank complied with capital requirements in that jurisdiction, thereby preventing the CBR from repatriating funds.

42. On May 3, 2018, Citibank published a Notice to Noteholders that Peters International Investment N.V. and Promsyvaz Capital B.V. were officially in default on the interest payments due under the USD 2019 Notes.

43. On July 3, 2018, on behalf of the Investors, my firm commenced proceedings in the High Court of Justice, Business and Property Courts of England and Wales, against the following persons and entities:

    a. Dmitri Ananyev;

    b. Alexei Ananyev;

    c. Antracite Investment Limited;

    d. Urgula Platinum Limited;

    e. Menrela Limited;

    f. Promsyvaz Capital B.V.;

    g. Peters International (Cayman) Limited;

    h. Peters International Investment Limited N.V.;

    i. Postscriptum Capital Limited; and

    j. Fintailor Investments Limited.

Each of the corporate entities is owned or controlled by the Ananyev Brothers (collectively, and inclusive of the Brothers, the "Ananyev Group"). The Investors filed an application with the Court to freeze the assets of the Ananyev Group in order to secure the amount of damages claimed by my clients – USD 15.6 million and EUR 11 million. On July 13, 2018, the Investors obtained an

order requiring the Ananyev Group to post security in the amount of the claimed damages or have their assets frozen. The Ananyev Group posted the full amount of damages with the Court.

44. The application to obtain a freezing order was filed in support of the Investors' claims against the Ananyev Group for conspiracy, misrepresentation and/or deceit, which were also filed on July 13, 2018. In addition to damages, the Investors are also seeking: rescission of the Loan Notes; a declaration that equitable title to the Investors' funds vests or re-vests in the Investors; accounts and inquiries as to dealings with Investors' funds; together with an order for the payment of all sums found due upon the taking of such accounts and inquiries, interest and costs. These are all viable causes of action under English law and appropriate for this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: August 16, 2018

_____
Andrew J. Ford